**UNITED STATES v. STEELE.**

No. 9347.

Circuit Court of Appeals, Sixth Circuit.

June 4, 1943.

Keith L. Seegmiller, of Washington, D. C. (Horace Frierson, Jr., and A. O. Denning, both of Nashville, Tenn., Richard N. Ivins, of Chattanooga, Tenn., and Francis M. Shea, Lester P. Schoene, Wilbur C. Pickett, and Fendall Marbury, all of Washington, D. C., on the brief), for appellant.

Harry G. Nichol and A. H. Roberts, both of Nashville, Tenn. (Robert & Roberts and Harry G. Nichol, all of Nashville, Tenn., on the brief), for appellee.

Before ALLEN, HAMILTON, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

On a prior appeal to this court a judgment of the district court, in favor of Dan C. Phillips, was reversed and the case remanded for a new trial. A recital of the factual background and the issues appears in the opinion on that appeal. United States v. Phillips, 6 Cir., 94 F.2d 903. In the mean-

time, Phillips has died; and on a retrial, his administrator was awarded a verdict by a jury, in accordance with which, judgment was entered. The Government brings the case before us for review, claiming error in the trial court's denial of the motions to direct a verdict, and for judgment non obstante.

The issue in the controversy in whether Phillips, a war veteran, became totally and permanently disabled while his Government insurance was in force.

In reversing judgment on the prior appeal, it was held that the proofs were insufficient to support the claim of total, permanent disability during the life of the policy. On the retrial, there was introduced the evidence taken on the former trial and, in addition, the testimony of numerous other witnesses on the question of the nature, character, and extent of the claimed disability.

The contention of the Government is that Phillips had not become totally and permanently disabled by June 30, 1919, the date on which the insurance policy expired for nonpayment of premiums; and such contention is based upon the evidence that Phillips was employed after the above-mentioned date and subsequently received earnings from such employment for many years. These earnings were from employment: at the Old Hickory Powder Plant, from June 13, 1919, to December 26, 1920; in Government Vocational Training, from September 3, 1921, to January 6, 1922; at the county clerk's office, from September, 1922, to June 1925; at the Royal Milling Company, from July, 1925, to December, 1925; at the county clerk's office, from September, 1926, to January, 1930; and at the same office, from February, 1930, to March 1934.

■ On the question of disability, we recite the evidence, which is practically undisputed; and, in any event, that adduced by the plaintiff is to be accepted and the case considered in the most favorable light to him, on review of the verdict and judgment.

Phillips was badly wounded in battle while fighting in France in 1918; he was carried from the battlefield on a stretcher, to a first aid station, then transported to a field hospital, and later to a base hospital; and in 1919, he was carried to a hospital ship, returning to the United States. On arrival in this country, he was placed in an evacuation hospital and, thereafter taken to the hospital at Fort Oglethorpe. On May 20, 1919, he was discharged from this last-named hospital before the medical authorities were ready to consent thereto. His father and friends were able to procure the discharge, however, in order to take him home. At that time, while his wounds appeared to have healed, he was still suffering pain, which had been treated by daily massage at the various hospitals. The massage treatments were continued after he was taken home from Fort Oglethorpe.

It was only three weeks after he left the hospital—against the advice of the medical authorities, and while still suffering pain, that he secured employment at the powder plant—and it was less than six weeks after he left the hospital, that the policy lapsed. He had been working at the powder plant before the war, and as he was leaving to join the Army, had been told by the superintendent, that a job would be waiting for him, if he ever came back. The company official testified that he was given the job, because he had been so well liked there, "and he was crippled up so badly, when he got back from overseas." The so-called job required no physical effort. Phillips sat in a chair, as a member of the plant police. In cold weather, he was assigned to drive a patrol wagon, which permitted him to sit inside by the fire for 7½ hours out of 8. During this time, he was often unable to dress himself, because of pain.

When the Government sold the plant to a private company, and employment hours were increased, he was unable to continue, even at this work. Subsequently, after a short time on his father's farm, he enrolled in a course of Government Vocational Training in electrical work on automobiles. He was assigned to the battery department, but the mere lifting of batteries caused him such pain that he gave up the training, on the advice of a representative of the Veterans' Bureau. He then went back to his father's farm for about a month, and afterward assisted a Mr. Hill, who was a candidate for the office of county clerk. Because Phillips had a large acquaintance in the county, he drove Hill around for a couple of months; but during this campaign there were days when he could not accompany the candidate because of the pain he suffered. When Hill was elected, he gave Phillips a job in the office, although Phillips

advised him it was doubtful whether he could hold it. But he was told that things could be arranged so that he could hold this political job. His duties were to make assessments, issue licenses, and look up people who had obtained licenses. He had no regular hours, and was permitted to go whenever he wished. A substitute was employed for the sole purpose of assisting him. He finally gave up the job because of the pains in his arm and because he was "irritable, torn to pieces, and sick" and felt he should be paid more to stay on—but this could not be arranged.

Phillips gave up his job with the Milling Company because riding in a car hurt his back, and he was feeling so badly, especially during cool weather, when he suffered greater pain. His various periods of employment with the different county clerks were on his own terms as to hours. Everyone in the office knew that he was given the job because he was a wounded veteran; and he was kept on because of the requests of his many friends. His employment in the county clerk's office was merely political.

In the period subsequent to his release from the hospital, he suffered almost continuously from pain in the chest, shoulder, and arms. He could not stand on his feet, except for brief periods; he limped when he walked; he could walk only short distances; and often had to be helped in walking. He also suffered from pain in the ears, was extremely nervous, and had unusually high blood pressure.

On the first trial, it appeared, as disclosed in the former opinion of this court, that Phillips was found to have had high blood pressure in 1928. On the last trial, there was medical testimony that an examination in 1922 revealed this condition. Furthermore, in the last trial it appeared that Phillips was suffering almost continuously from severe pain in the chest immediately after his discharge from the hospital—in fact, the chest pains caused the greatest amount of his suffering; and these facts were borne out by the testimony of numerous witnesses who had not appeared on the first trial. In addition, it was shown that, starting with the period immediately after he left the hospital, Phillips suffered from these pains whenever he walked. "He complained with his chest, that he couldn't get enough breath." Accordingly, he often required assistance in walking from place to place; and, of course, his

death, which occurred subsequent to the first trial, resulted from a rupture of the heart wall. This evidence, appearing subsequent to the first trial, changes the view to be taken, as compared to that on the prior appeal. It strongly tends to show that Phillips was gravely suffering from pain emanating from his heart, from the time he left the hospital—and that this condition was not one that arose nine years thereafter.

During his various employments, he often did not appear for weeks at a time. on one occasion he was absent for two months, and at another time, for six months. One of his doctors told him to "pass everything up" and that he would have to "quit or die." X-ray and fluoroscopic examinations made in 1930 and 1933, showed an enlargement of his heart and of the arch of the aorta. In 1932 apparently for the first time, it was found that a metallic foreign body was lodged in the wall of the aorta, and another in the apex of the left lung. It was the opinion of one of the medical witnesses that the foreign body in the aorta had developed a dilation known as an aneurism, and that a piece of metal in the aorta will produce irritation and pain, with a danger of rupture.

One medical witness had advised Phillips to avoid exertion and lead a quiet, sedentary life; another gave it as his opinion that a man in Phillips' condition should not have worked; that even the work done by him in the county clerk's office, endangered his life; that the trouble was the dangerously high blood pressure; and that the piece of metal in the heart wall was liable to cause rupture of the aneurism that had been formed. Phillips' death resulted from a rupture of an aneurism of the aorta.

Dr. Dunklin, who, when in the Army, had seen a soldier who survived shellfire, with a piece of shrapnel in his heart, expressed the opinion that the piece of metal in the wall of Phillips' aorta, was blown there by the explosion of a shell. Such a conclusion seems plausible, and based on probability, in view of the fact that one soldier, who was behind Phillips when he was wounded said that he had seen him blown about 50 feet by the high explosive shell; and that he was wounded by shrapnel that went through his hands and fingers, tore out the inner part of the left thigh, gashed open his arm, tearing away the muscles, shot off a part of his knee, and left him unconscious

and bleeding from the ears. No other suggestion as to how the piece of metal lodged in Phillips' heart, is mentioned.

■ The Government relies on United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 276, 79 L.Ed. 617, where it was said "that work done may be such as conclusively to negative total permanent disability at an earlier time." But it was also stated in that case: "It may not be assumed that occasional work for short periods by one generally disabled because of impairment of mind or body, does as a matter of law negative total permanent disability."

Although many of the different periods of Phillips' employment were of considerable duration, the actual time during which he performed even the lightest duties, or during which he was even present at the place of work, was often broken up from hour to hour—with long periods in which he did nothing, although during those entire periods he was carried on the books, and paid, as an employee.

■ Nor is this case similar to the Spaulding case, in which medical testimony was held to be without weight, where a doctor had examined a veteran shortly before trial, and stated that the progressive heart disease which he then found, in his opinion, dated back to many years prior thereto. In the case before us, the evidence discloses what obviously caused the pain, suffering, and disability—a piece of shell lodged in the heart wall, which was not discovered until 14 years after the veteran was wounded. Certainly, reasonable inferences can be drawn that the pain which the veteran suffered, and his perilous physical condition as disclosed by the testimony, resulted from this piece of metal, which was doubtlessly a shell splinter. We are not here required to accept a speculative opinion that this condition of the heart probably existed before 1919. The evidence supports the conclusion that the steel splinter was in the veteran's heart at that time and that, as a result, he not only suffered, but was really unable to work except at light tasks for short periods, and even then, at the risk of endangering his life.

On a review of the record, we are of the opinion that the evidence now before us, was sufficient to sustain the verdict of the jury.

The judgment of the district court is affirmed.